230 N.J. Super. 345 (1989)
553 A.2d 814
MORRIS COUNTY FAIR HOUSING COUNCIL, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR ADVANCEMENT OF COLORED PEOPLE AND ALFRED A. SLOCUM, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFFS, AND JOHN AND SALVATORE CORTESE, HOLLOW HILL ASSOCIATES AND SENTRY MORRIS ASSOCIATES, PLAINTIFFS-INTERVENORS,
v.
BOONTON TOWNSHIP, CHATHAM TOWNSHIP, CHESTER TOWNSHIP, DENVILLE TOWNSHIP, EAST HANOVER TOWNSHIP, FLORHAM PARK BOROUGH, HANOVER TOWNSHIP, HARDING TOWNSHIP, JEFFERSON TOWNSHIP, KINNELON BOROUGH, LINCOLN PARK BOROUGH, MADISON BOROUGH, MENDHAM BOROUGH, MENDHAM TOWNSHIP, MONTVILLE TOWNSHIP, MORRIS TOWNSHIP, MORRIS PLAINS BOROUGH, MOUNTAIN LAKES BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY TROY HILLS TOWNSHIP, PASSAIC TOWNSHIP, RANDOLPH TOWNSHIP, RIVERDALE BOROUGH, ROCKAWAY TOWNSHIP, ROXBURY TOWNSHIP AND WASHINGTON TOWNSHIP, DEFENDANTS, AND SOUTHWEST MORRIS TOWNSHIP HOMEOWNERS ASSOCIATION, DEFENDANT-INTERVENOR. MURWIN DEVELOPMENT CORP., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
TOWNSHIP OF MORRIS, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MORRIS AND THE PLANNING BOARD OF THE TOWNSHIP OF MORRIS, DEFENDANTS. HOLLOW HILL ASSOCIATES, A GENERAL PARTNERSHIP UNDER THE LAWS OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MORRIS TOWNSHIP PLANNING BOARD, DEFENDANT-APPELLANT, AND TOWNSHIP OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1989.
Decided January 20, 1989.
*347 Before Judges SHEBELL, GRUCCIO and LANDAU.
James R. Hillas, Jr., argued the cause for appellant.
Alfred L. Ferguson argued the cause for respondent (McCarter & English, attorneys; Alfred L. Ferguson, Gary T. Hall and Susan R. Kaplan, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Defendant Morris Township Planning Board (Board) appeals from a judgment of the Law Division which set aside the Board's denial of site plan approval of a 292-unit housing complex on 64 acres of land, of which 64 units will be Mt. Laurel units, affordable to low or moderate income families. See So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 67 N.J. 151 (1975). The Board denied plaintiff Hollow Hill Associates a waiver or variance from that portion of the zoning ordinance requiring a 50-foot landscaped buffer between buildings and neighboring property lines.
*348 Plaintiff seeks relief from this requirement because a portion of its property is burdened with a utility easement, the terms of which prohibit landscaping on the area covered by the easement. Plaintiff intends to comply with the objective of the buffer requirement by providing landscaping on other property parallel to the neighboring property line.
The Law Division Mt. Laurel judge held that the Board was arbitrary in failing to give plaintiff a waiver from the buffer requirements of the ordinance. He further held that the Board had no authority to deny site plan approval based on the plaintiff's refusal to commit itself to a particular architectural style of the buildings, which was an alternative basis for the Board's denial.
Litigation was initially brought by the Public Advocate and others against 27 Morris County municipalities alleged to have exclusionary zoning ordinances. The situation is described more fully in the Law Division's opinion in this case, 220 N.J. Super. 388, 392-93 (Law Div. 1987), and in a prior opinion at 197 N.J. Super. 359 (Law Div. 1984), aff'd 209 N.J. Super. 108 (App.Div. 1986). In 1984 Morris Township entered into a settlement agreement with the Public Advocate. The township agreed to rezone several tracts of land, including that owned by plaintiff, to permit and facilitate the construction of Mt. Laurel housing. In August 1985 defendant Board gave conditional approval to plaintiff's general development plan, one of the conditions being that plaintiff obtain site plan approval.
Plaintiff submitted an application in September of 1985, which the Board denied "without prejudice" on April 7, 1986, on the ground that plaintiff had made significant changes in its development plan. Plaintiff filed an action in lieu of prerogative writ; however, plaintiff and the Board resolved their differences, and by consent order dated May 14, 1986, plaintiff's application was remanded to the Board. In July 1986 plaintiff and two other developers with pending site plan applications for developments which included Mt. Laurel housing *349 moved for relief against the Board based in part on the Board's alleged delay in processing their applications for development. By order dated August 13, 1986, plaintiff intervened in the underlying lawsuit brought by the Public Advocate. Following the Board's rejection of plaintiff's application for site plan approval as mentioned above, plaintiff moved before the Mt. Laurel judge to set aside the denial. In response to the May 26, 1987 order of reversal from the Law Division, the Board adopted a resolution "under protest" approving the site plan subject to conditions. The Law Division order was certified as final, pursuant to R. 4:42-2, and defendant filed the within appeal.
The property in question, a 64-acre tract of land known as the Moore Estate, is located in the RH-5 zone which is designed for a combination of high-income housing and lower-income units on relatively large sites. It is bisected east to west by Woodland Avenue. The upper or northern portion contains 52 acres and held a large manor house and several out buildings. The upper portion is elevated and has steep slopes. The 12 acres to the south are low-lying and relatively flat. All of the lower-income units are to be constructed on the southerly tract. One of the provisions in the municipality's Mt. Laurel ordinance permits applicants of 10 or more acres to submit a general development plan (GDP) prior to seeking site plan or subdivision approval.
On August 5, 1985, the Board granted GDP approval to plaintiff. At that time, plaintiff intended to construct 297 units, 63 of which would be affordable to lower-moderate income people. After obtaining GDP approval, plaintiff submitted the project to the Board for site plan approval. Thereafter plaintiff revised its plans on a couple of occasions, at first reducing the number of units to 279 and then in March 1986 increasing the number to 314. A reason for the redesign was the fact that the southerly portion of the property had approximately 1.2 acres of unbuildable wetlands. The Board felt that the GDP approval could not be extended to a 314-unit complex and denied site *350 plan approval without prejudice. This denial triggered plaintiff's aforementioned complaint in lieu of prerogative writ which resulted in the initial settlement with the Board.
In the proposal ultimately submitted to the Board for 228 market-rate units and 64 Mt. Laurel units, plaintiff sought only relief from § 95-72 of the municipality's Mt. Laurel ordinance which requires a 50-foot, landscaped buffer. That section reads as follows:
All development shall maintain a fifty-foot minimum buffer to all exterior property lines. Said buffer shall be bermed or landscaped and remain unoccupied except for entrance roads or utilities. Buffers may include minimum yard requirements for all single-family, two-family and townhouse development.
The southern boundary of plaintiff's property is subject to a utility easement held by Texas Eastern Gas Transmission. This easement cannot be bermed and cannot be planted with shrubbery or trees. Therefore, plaintiff proposed to create a buffer of between 100 to 140 feet by utilizing a bridle path owned by the Morris County Park Commission and a conservation easement on property further to the south owned by plaintiff.
The proposal was described in detail by plaintiff's engineer in a certification to the trial judge as follows:
Immediately adjoining the southerly property line of the Moore Estate along which the pipeline easement runs, is a bridle path owned and operated by the Morris County Park Commission. This bridle path at its widest point is approximately 50 feet and 25 feet at its narrowest point. The bridle path is landscaped. The horse trail is relatively narrow, and there are significant mature trees on both sides of the horse trail. Accordingly, the total buffer area is increased by the bridle path property to a minimum of 75 feet with mature trees on the bridle path itself. In addition, the developer-applicant owns the lot immediately to the south of the bridle path. On this lot there is a single family house (which is not part of the development application before the Planning Board); the lot is ± 93 feet wide. The developer offered, as additional landscaping, a permanent 15 foot conservation easement on this lot, next to the bridle path on which would be planted three (3) rows of fast growing evergreen pine trees at staggered intervals. Accordingly, the 100 feet buffer (including the bridle path on which there are already mature trees growing) will now be augmented by a very dense screen of evergreen vegetation at a distance ranging from 100 to 140 feet from the nearest structure on the Moore Estate. [Emphasis in original].
*351 The neighboring property nearest the Mt. Laurel units would be approximately 168 feet away from the closest structure on the subject property. At the Board hearings, plaintiff's professional planner testified that the proposed solution would be at least equivalent to a 50-foot wide buffer strip that was bermed and landscaped, and that there was no health or safety reason why the proposal should not be approved. Likewise, plaintiff's engineer testified that in his opinion plaintiff would be providing a more adequate buffer and a better screen than if it had simply bermed or planted on the land traversed by the easement. There was no evidence before the Board that the proposal would not create an effective screen. However, a neighbor and one Board member expressed doubts as to whether plaintiff's proposal would be sufficient. Concern about the style of the complex, particularly the Mt. Laurel buildings, was expressed by neighbors who charged that when plaintiff sought GDP approval its principals promised residents they would not be able to tell the difference between the low-income housing and the other units, while now the differences in quality and appearances were obvious.
The Board in denying plaintiff's request for a waiver from the buffer requirement stressed that plaintiff presented no testimony that the site could not be developed without the waiver. The Board felt that the buffer requirement was particularly important along the southerly side of the parcel because of the changed facades on the Mt. Laurel structures. It concluded that Mt. Laurel housing "should only be built in strict conformity with the requirements of the zoning ordinance." The Board acknowledged that it lacked the power to dictate style as long as an applicant complies with all other ordinance requirements; however, it believed the question of style was relevant here because of plaintiff's request for a waiver from the buffer requirement and the greater need for adequate screening and buffering because of the inferior appearance of the Mt. Laurel units.
*352 The Mt. Laurel judge concluded that the Board was wrong in deciding that waivers for Mt. Laurel units should be sparingly granted as the Supreme Court had mandated in Mt. Laurel II (see So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983)) that municipalities eliminate all barriers to the construction of lower income housing except those which were necessary to protect public health and safety. 220 N.J. Super. at 403-04. The judge concluded that it was arbitrary and capricious for the Board to deny a waiver because the uncontroverted evidence showed that plaintiff's proposal would be at least as adequate as compliance. Id. at 407. He also concluded that the Board's decision could not be justified on the ground that plaintiff refused to commit itself to a particular architectural style. Ibid. He observed that even if the Board could demand architectural plans because of the request for a waiver, plaintiff's refusal to commit itself could not provide a basis for denial because plaintiff's buffering plan was "more than adequate to satisfy the objectives of the buffer requirement...." Id. at 408.
Defendant urges that the trial court erred in setting aside defendant's denial of plaintiff's request for a waiver from the 50-foot buffer requirement because plaintiff never offered any proof that it could not build the low-income units in a different location. The Board's resolution denying site plan approval characterized plaintiff's request for relief from the buffer requirement as a waiver under Morris Township Land Development Code, § 95-80.
The Law Division judge relied on § 95-80 in his legal analysis (220 N.J. Super. at 404), without suggesting that the request for relief might be reviewed as a variance rather than a "waiver." On appeal defendant argues for the first time that the waiver described in § 95-80 applies only to the engineering and construction design standards and that to qualify for relief, plaintiff had to establish the criteria for a waiver from site plan standard set forth in N.J.S.A. 40:55D-51b, or a variance under N.J.S.A. 40:55D-70c. Plaintiff urges that even if defendant's *353 argument is valid, the record establishes that plaintiff met the criteria for a variance from the buffer requirement under N.J.S.A. 40:55D-70c(2).
We agree that the waiver provisions of the ordinance do not apply to buffer requirements. The waiver provision of the municipality's Mt. Laurel ordinance states:
Notwithstanding any provision set forth elsewhere in this ordinance, the Planning Board may waive any engineering and construction design requirements contained in this ordinance in order to achieve the objectives of the RH-5 and RH-16 Zones, provided that the Planning Board shall be satisfied that such a waiver does not jeopardize the public health and safety. [§ 95-80A].
The "engineering and construction design requirements" contained in the ordinance are set forth in considerable detail at § 95-79. Those engineering and construction design requirements include standards for drainage, lighting, sewers, streets and water supply, but say nothing about buffers. Ordinance § 95-72 states:
All development shall maintain a fifty-foot minimum buffer to all exterior property lines. Said buffer shall be bermed or landscaped and remain unoccupied except for entrance roads or utilities. Buffers may include minimum yard requirements for all single-family, two-family and townhouse development.
Under plaintiff's interpretation of the municipality's Mt. Laurel ordinance, every standard set forth therein would be subject to the waiver provisions of § 95-80A, including standards regarding bulk area and yard requirements, density, distance between buildings, off-street parking and floor area ratio. These are not, in common parlance, engineering and construction design requirements, and they are not treated that way in the ordinance. Rather, § 95-79 specifically states that drainage, lighting, sewage and the like are engineering and construction design standards. A developer seeking to deviate from other ordinance requirements, like tract size or bulk standards, would have to pursue avenues of relief set forth in the Municipal Land Use Law, and particularly either a hardship exception from site plan standards under N.J.S.A. 40:55D-51 or a variance from zoning regulations, as authorized by N.J.S.A. 40:55D-70.
*354 We are satisfied that the buffer requirement is a zoning standard governed by N.J.S.A. 40:55D-70. Under this statute the board of adjustment (or the planning board pursuant to its ancillary jurisdiction under N.J.S.A. 40:55D-60) shall have the power to grant a variance of any regulation "pursuant to Article 8 of this act." N.J.S.A. 40:55D-70c & d. Article 8 of the Municipal Land Use Law refers to N.J.S.A. 40:55D-62, et seq., entitled "ZONING." The permissible contents of a zoning ordinance are in N.J.S.A. 40:55D-65, which provides, in pertinent part that:
A zoning ordinance may:
........
b. Regulate the bulk, height, number of stories, orientation, and size of buildings and the other structures; the percentage of lot or development area that may be occupied by structures; lot sizes and dimensions; and for these purposes may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air, including, but not limited to the potential for utilization of renewable energy sources.
The buffer requirement is part and parcel of bulk or area regulation the purpose of which is to regulate the intensity of land use. It should not be considered a subdivision or site plan regulation, for which relief is available under N.J.S.A. 40:55D-51. That section states, in pertinent part:
b. The planning board when acting upon applications for preliminary site plan approval shall have the power to grant such exceptions from the requirements for site plan approval as may be reasonable and within the general purpose and intent of the provisions for site plan review and approval of an ordinance adopted pursuant to this article, if the literal enforcement of one or more provisions of the ordinance is impracticable or will exact undue hardship because of peculiar conditions pertaining to the land in question.
Permissible requirements for site plan approval are set forth in N.J.S.A. 40:55D-38, 39 & 41. Generally, those provisions authorize regulations governing the location of structures, the construction of streets and utilities, and on-site traffic circulation.
We are cognizant that N.J.S.A. 40:55D-41 states, in pertinent part, that "[a]n ordinance requiring site plan review and approval *355 ... shall include and shall be limited to ... standards and requirements relating to: ... c. Screening, landscaping and location of structures...." Nonetheless, we are convinced that the buffer requirement under review is indeed a "zoning requirement."
We conclude in any event that the record establishes that plaintiff was entitled to a variance under N.J.S.A. 40:55D-70c(2). A board may grant a variance where the purposes of the Municipal Land Use Law "would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment," N.J.S.A. 40:55D-70c(2), provided the applicant can satisfy the negative criteria.
The flexible "c" variance received its first comprehensive interpretation by our Supreme Court in Kaufmann v. Planning Bd. For Warren Tp., 110 N.J. 551 (1988). The Court held that the grant of a c(2) variance "must be rooted in the purposes of zoning and planning itself and must advance the purposes of the MLUL [Municipal Land Use Law]." Id. at 562. Elaborating, the Court said:
By definition, then, no c(2) variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property. The focus of a c(2) case, then, will be not on the characteristics of the land that, in light of current zoning requirements, create a "hardship" on the owner warranting a relaxation of standards, but on the characteristics of the land that present an opportunity for improved zoning and planning that will benefit the community. [Id. at 563; emphasis in original].
While the Mt. Laurel judge did not address the issues within the legal framework of N.J.S.A. 40:55D-70c(2), his analysis reflects a finding that the applicant's proposal clearly provides greater benefits and that a conclusion to the contrary was arbitrary and capricious. 220 N.J. Super. at 406-07. The Board's conclusion that vegetation must be close to a building to effectively screen it is not supported by evidence or common experience. Plaintiff's proposal results in a substantial buffer fully comparable to or better than the required 50-foot setback.
*356 Consequently, in light of the obvious zoning benefit (Mt. Laurel II) and the nonexistent detriment, the Board's contrary conclusion is arbitrary. We adopt the Mt. Laurel judge's analysis of the benefits and burdens of plaintiff's proposal as it disposes of any claim that a variance would offend the negative criteria. There is no showing in the record that the proposal would substantially impair the zone plan or negatively impact on the public good.
Defendant contends that the court erred in concluding that the Board could not consider architectural style in denying plaintiff's application. The Board cites the testimony that plaintiff's architectural plans have degenerated from an attractive complex to a barracks-type structure for the Mt. Laurel units. Plaintiff asserts the Board has no power to consider architecture in a site plan application and that even if it does that power was arbitrarily exercised here as the matter of architecture is purely subjective, and the Board gave no fair warning to the developer. It also urges that in a Mt. Laurel project architectural requirements are improper as they are cost generating.
In its resolution, the Board linked its concerns over the applicant's architectural changes with the request for a waiver. The Board reasoned:
The Board recognizes, as it must, that it does not sit as an architectural review board and that generally the style of architecture is the exclusive prerogative of the applicant as long as all other ordinance requirements are met. As will be seen in Point IV infra applicant is seeking relief from the 50 foot buffer requirement mandated by ordinance. The Board concludes that applicant's inability to comply with the buffer requirements makes the question of architectural style a relevant one and permits the Board to weigh and consider such issue in considering the application for ordinance relief. It is the consensus of the Board that applicant's departure from the generally acceptable architectural treatment of the Mount Laurel units presented at the time of GDP application weighed heavily against its claim for buffer relief. The greater the degree of departure, the greater the necessity for strict buffering to mitigate the revised facades and applicant's general failure to adhere to the promises made at the GDP hearings. [Emphasis in original].
In holding against the Board on this issue, the Mt. Laurel judge reasoned:

*357 Furthermore, the board's decision cannot be justified by the fact that Hollow Hill withdrew an architectural rendering of the proposed development from its site plan application. No authority has been cited for requiring the submission of an architectural rendering as part of an application for approval of a site plan for a Mount Laurel development in Morris Township. Cf. Morristown Road Assoc. v. Mayor of Bernardsville, 163 N.J. Super. 58 (Law Div. 1978). Furthermore, even if the board could assert authority with respect to architectural plans under appropriate circumstances, the withdrawal of such plans did not provide a rational basis for denying Hollow Hill's application for approval of its buffering proposal. Rather, as previously indicated, this plan was more than adequate to satisfy the objectives of the buffer requirement of the zoning ordinance, without imposing special architectural design requirements upon the developer. [220 N.J. Super. at 407-08].
A planning board cannot deny an application for site plan approval based on architectural considerations if the application meets the standards set forth in the site plan ordinance. See Sheston Oil v. Bor. of Avalon Planning Bd., 214 N.J. Super. 593, 598-99 (App.Div.), certif. den. 107 N.J. 134 (1987). Morris Township has no ordinance standards regulating residential architecture. Cf. Morristown Rd. Assoc. v. Mayor of Bernardsville, 163 N.J. Super. 58, 66-67 (Law Div. 1978).
Aesthetic considerations have been recognized as proper factors in zoning and planning. Piscitelli v. Tp. Comm. of Tp. of Scotch Plains, 103 N.J. Super. 589, 597-98 (Law Div. 1968). One of the express purposes of the Municipal Land Use Law is to "promote a desirable visual environment through creative development techniques and good civic design and arrangement...." N.J.S.A. 40:55D-2i. It has been held that aesthetics can properly be considered in determining whether special reasons exist for the grant of a "d" variance. Kessler v. Bowker, 174 N.J. Super. 478, 486 (App.Div. 1979), certif. den. 85 N.J. 99 (1980). In the context of a "c" variance it has been held that the appearance of a house to be built on a nonconforming lot is of legitimate concern to the Board. Commons v. Westwood Zoning Board of Adjustment, 81 N.J. 597, 610 (1980). However, in the present case it was arbitrary for the Board to deny a buffer variance because plaintiff would not commit itself to a particular architectural style. This is so for the *358 simple reason that plaintiff will provide as effective screening as is required by ordinance, albeit in a different way.
The judgment of the Law Division is affirmed.